## BALLIN *et al. v.* MAGONE.

*(Circuit Court, S. D. New York. April, 1890.)*

**1. CUSTOMS DUTIES—CLASSIFICATION—MANUFACTURES OF WORSTED.**
Worsted cloths or coatings, known in the trade as "diagonals," "corkscrews," "fancy weaves," etc., manufactured entirely of yarn produced from wool of the sheep by carding, combing, and spinning, a process resulting in a product known in 1883 and prior thereto as "worsted yarns," are "manufactures of worsted," under Schedule K, (paragraph 363, Tariff Index, New,) of the tariff act of March 3, 1883.

**2. SAME—WOOLEN CLOTHS.**
The statute itself recognizes a difference between woolen and worsted articles; and the words "woolen cloths," used in paragraph 362 of the same schedule, are to be taken as including only those woolen cloths which are not worsted, or composed of worsted, within the meaning of those terms as used in the tariff act.

*(Syllabus by the Court.)*

At Law.

Action to recover back duties alleged to have been illegally exacted by the defendant, collector of the port of New York. The goods involved in the present suit were imported by the plaintiffs from England in April, 1889, and were entered as "worsteds," under Schedule K of the act of March 3, 1883, (paragraph 363, Tariff Index, New,) a part thereof being valued at not exceeding 80 cents per pound, and claimed to be dutiable at 24 cents per pound and 35 per cent. *ad valorem*, and a part at not exceeding 60 cents per pound, and dutiable at 18 cents per pound and 35 per cent. *ad valorem*. The collector classified the merchandise as "manufactures of wool," and as "woolen cloth," valued at less than 80 cents per pound, and dutiable at 35 cents per pound, and 35 per cent. *ad valorem*, under paragraph 362 of the same schedule. The plaintiffs duly protested, and appealed from the decision of the collector to the secretary of the treasury, who affirmed the classification of the collector. The plaintiffs' witnesses proved on the trial that the goods in suit were manufactured, as to part of them, from fine, cross-bred Australian wool, of a fibre of from 2½ to 5 inches in length, and, as to the rest, from low grade Australian cross-bred wool, of a fibre varying from 5 to 9 or 10 inches in length; that the wool was scoured and otherwise prepared; then carded, and afterwards combed by a machine known as the "Noble Comb," by which latter process the "noils" or short and broken fibres were removed, and the remaining fibres laid straight and parallel, resulting in a product known as "top," which was further drawn out by a process of "gilling" and drawing, and finally spun into worsted yarn, and that the goods in suit contained nothing but such yarn; that so-

called "woolen yarn" was not combed, nor the fibres of the wool laid parallel, nor the "noils" extracted. Plaintiffs also produced testimony to show that yarns similar to those from which the goods in suit were manufactured were known to the trade and commerce of the United States, in and prior to the year 1883, as worsted yarns, and that the Noble comb had been used in the manufacture of such yarns as far back as 1871; also that goods similar in character and quality to those in suit were imported into the United States in 1882 and prior thereto; that they were known in the trade at that time as "worsteds," "worsted coatings," and by other special names. That the term "woolen cloth" had a restricted meaning in the trade at the date of the passage of the tariff act of 1883, and referred to broadcloth.

The defendant offered to prove that only long "combing wool" of from 5 to 12 inches fibre was "combed" and spun into worsted yarn at the date of the passage of the tariff act of 1867, and of prior tariff laws; also to show what were known as "worsted stuff goods" before 1867,—all of which testimony was excluded by the court. Defendant then proved, by uncontradicted testimony, that in 1883 fine, short staple clothing wool, not exceeding 1½ inch in length of fibre, could be converted by the Noble comb and the so-called "worsted process" into worsted yarn, or by the so-called "woolen process" into woolen yarn; that much of the process was the same in both cases, including the carding of the wool, and that both characters of yarn were spun on the same spinning-machines, "throstle frames," and "mules," the "mule" giving in both cases a soft, tender yarn; that the process of weaving the so-called "worsted cloths" was identical, or nearly so, with the weaving of so-called "woolen fabrics;" that the worsted cloths were often "milled and fulled," viz., shrunk by machinery acting with soap and water, in a similar manner to woolen fabrics, although in a less degree; that the worsted coatings were "gigged," so as to raise the nap slightly, very much as other woolen cloths were "teasled;" that the worsteds were "sheared" or "singed" by a process closely resembling the treatment applied to the so-called "woolens." Defendant proved by expert testimony that a "tapestry worsted" yarn was known to the carpet trade in 1883 which was not "combed," but was spun with the short fibres or "noils" among the longer; also that there was an article in the trade known as "cotton worsted," which contained no wool whatever. The defendant produced a number of witnesses prominent in the trade, who testified that in 1883 and prior thereto the words "woolen cloths" had no different meaning in trade and commerce from the ordinary signification of those words in the English language, and included all the varieties of woven fabrics made of wool suitable for garments and other purposes, which fabrics were known by a great number of special names, such as "broadcloth," "cassimeres," "beavers," "chinchillas," "worsteds," "diagonals," "corkscrews," "serges," etc. At the close of the testimony the plaintiffs' counsel moved the court to direct a verdict for the plaintiffs, and the United States attorney made a like motion for a direction in favor of the defendant. The court denied both motions.

The plaintiffs presented to the court a number of requests to charge the jury, the principal being that the tariff recognized a distinction between wool and worsted, and differentiated them; that the designation of "cloth" is not more distinctive than the term "manufacture of worsted." The defendant likewise presented a number of requests, the following being the principal:

"Worsted cloth or worsted suitings are not mentioned or provided for by either of those names or designations in the tariff act of March 3, 1883, and if the jury find they were generally known and considered as belonging to and included within the class designated 'woolen cloths,' at the time of the passage of said act, their verdict should be for the defendant. (Refused except as charged.) * * * The names 'worsted suitings' or 'worsted cloth,' under which names the plaintiffs claim the merchandise in suit was known in trade and commerce in 1883, not being in the tariff act of 1883, the burden of proof is on the plaintiffs to show by satisfactory evidence, not merely that such merchandise was bought and sold by such trade names, but that the general words 'woolen cloths,' used in the tariff act, which otherwise would cover them, did not cover them in the trade and commerce of this country in 1883; and, unless the plaintiffs have furnished such evidence to the satisfaction of the jury, the defendant is entitled to a verdict. (Refused, except as charged.) * * * If the jury should find that the goods in suit are not within the general term 'woolen cloths,' but are fitly described or comprehended equally within the terms 'manufactures of wool' and 'manufactures of worsted,' their verdict should be for the defendant. (Refused, except as charged.)"

*Stanley, Clarke & Smith,* for plaintiffs.

*Edward Mitchell,* U. S. Atty., and *Henry C. Platt* and *James T. Van Rensselaer,* Asst. U. S. Attys., for defendant.

LACOMBE, J. (*charging jury.*) This controversy concerns articles claimed by both sides to be dutiable under Schedule K of the tariff of 1883, providing different rates of duty on articles generally described in the title to that schedule as "wool and woolens." One paragraph of that schedule, and it is the one under which the plaintiffs claim that their goods should be classed, reads as follows: "363. Flannels, blankets, hats of wool, knit goods, and all goods made on knitting frames, balmorals, woolen and worsted yarns, and all manufactures of every description, composed wholly or in part of worsted, the hair of the alpaca goat, or other animals, (except such as are composed in part of wool,) not specially enumerated or provided for in this act," shall pay duties varying according to their weight and value. You will observe, in connection with this paragraph, that the rate of duty on all the articles named therein is the same. Again, you will observe that two "yarns" are mentioned in the paragraph,—a "woolen yarn" and a "worsted yarn." Again, you will observe that the proviso or exception, "except such as are composed in part of wool," by the use of the plural word "are," refers to a plural subject. If it read "manufactures of every description, composed wholly or in part of worsted, the hair of the alpaca goat, or other animals, (except such as is composed in part of wool,)" —the proviso would refer to the composition of the worsted, and not to

the composition of the entire manufactures. In other words, if the singular word was used in the proviso, then the manufactures of worsted which are dutiable under the section would be only manufactures of the kind of worsted which have no wool in them. The paragraph under which the defendant claims is No. 362: "Woolen cloths, woolen shawls, and all manufactures of wool of every description, made wholly or in part of wool, not specially enumerated or provided for in this act," shall pay duties varying according to their weight and value, and at a higher rate, for corresponding weight and value, than the duty laid by the section under which the plaintiffs claim.

The defendant contends that these articles are dutiable either as as "woolen cloths," under the phrase "woolen cloths" in this paragraph, or as manufactures of wool. As woven fabrics, suitable for garments and other purposes, they are undoubtedly cloths. But the tariff does not in this paragraph provide for all cloths, but only for woolen cloths. Indisputably the plaintiffs' goods are made entirely of wool, in the sense that they are composed wholly of the hairy growth which is sheared from the back of the sheep. But are they by virtue of that fact alone to be classed for tariff purposes in the group known as "woolen cloths?" It appears that woven fabrics made of sheep's fleece or wool are very numerous, and no special trade use of the phrase "woolen cloths" is shown. In the ordinary use of language, that phrase would cover all such fabrics; and the mere use of special names for special varieties of such fabrics would not be sufficient to take them out of the group described by the general phrase, unless the general phrase was itself restricted by trade usage. The tariff act itself, however, recognizes a difference between woolen and worsted articles; between goods composed of worsted and goods composed of wool. We find the words "wool" or "woolen" and "worsted" used in contrast at least six times in this very schedule; and the examination of successive tariff acts, back to, I think, 1816, shows an unbroken continuance of such contrasting use. It seems plain, therefore, that the words "woolen cloths," used in the paragraph on which the defendant relies, are to be taken as including only those woolen cloths which are not worsted, or composed of worsted, within the meaning of those terms, (that is, "worsted," or "composed of worsted,") as used in this tariff.

Upon this distinction, then, between the wool which is known to the tariff act as "wool," and the wool which is known to the tariff act as "worsted," the determination of this case rests. If the articles imported by the plaintiffs are composed wholly or in part of worsted, and contain no wool, (except such worsted,) then they are entitled to your verdict; otherwise not. And, of course, the burden of satisfying you by a fair preponderance of proof that their goods are wholly of worsted rests upon them; for, as the collector is a public officer, his decision is presumed to be correct, in the absence of proof that it is erroneous.

Much of the difficulty which is encountered in customs suits is eliminated for you by the very full testimony produced by the plaintiffs. They have shown, by the evidence of the men who made these goods,

all the steps of their manufacture, from the fleece to the completed article. It is unnecessary for me to review this testimony. It has been so fully illustrated by samples of the successive products that I am sure, although it was given over a week ago, that you still remember it distinctly. It will be enough to remind you that it appears from the proof that the goods were woven from yarns produced by a process known in England and here as the "worsted process;" that one feature of that process was the operation known as "combing;" that yarn produced by that process was known in 1883, in England and here, as "worsted yarn;" that the wool from which that yarn was made came (as to some of the goods, the samples in the books) from Australian cross-bred sheep, and as to other of the goods (the samples in the brown paper) from English sheep. The evidence of the defendant further shows that wool, in all respects like the wool of which the yarn composing these goods was made, came to this country prior to 1883, and, as the witness Whitman says he testified before the tariff commission, (which sat in 1882,) was then very largely used in combing-mills in this country to make yarn for the manufacture of worsted cloth. As to what was the component material of these goods there can be little doubt. What you are next to determine is whether that component material is "worsted," within the meaning of that word as used in the tariff.

In passing these acts, congress, as you know, legislates for the trade and commerce of the country; and when it uses words which are recognized by persons engaged in that trade and commerce either as words of a common meaning, or as words with a special trade signification, it is supposed to use those words in the sense in which persons engaged in trade and commerce would understand them. What, then, did congress mean by the words "composed of worsted?" What is this "worsted" which congress refers to as something different from wool, although, as the evidence shows, it is in fact sheep's fleece? That is a question for you to determine, and to determine from the evidence. Without rehearsing the evidence on that branch of the case, I may briefly call your attention to one or two considerations which may assist you in reaching a conclusion. The distinction is not one which congress has created; evidently it found it in existence in the community and adopted it. While there may be contradictions between the testimony of the different witnesses on other points, there, is at least, substantial concurrence in the proposition that there is some difference between, for instance, worsted yarn (which one witness characterized as the crudest worsted product known to commerce) and woolen yarn. Again, that difference (between the yarns, I mean) is not a purely arbitrary one,— a difference in name only. There is, as the evidence shows, a difference in fact, whether such difference is accentuated solely by the process of manufacture, or partly, also, by the kind of wool used. Again, you will understand that congress, in legislating for the commerce of the country, does so after familiarizing itself with the conditions of such commerce. When, with the lapse of time, new processes become known to trade, old differences are obliterated, or new ones created, congress

is supposed to keep informed as to such change, and when it passes a tariff act we assume that it does so with full understanding of the conditions of things when it legislates. So, when in the tariff act of 1883 it uses a word which would be then recognized by community at large as expressing a particular idea, we may safely conclude that it uses that word to express the idea which it imported in 1883, not to express the idea which it may have imported in 1816. This we would be entitled to assume without evidence, but in this case we have proof to that effect. It appears that a commission sat to take testimony (among other things) as to the wool industry and the wool trade, and one of the witnesses who has testified here appeared before it, and gave evidence on behalf of an association,—the National Association of Wool Manufacturers, I think, was the name,—and it was upon the report of that commission that congress framed the tariff act of 1883. So you see that we are entitled to assume that congress knew the condition of things in 1883, and acted accordingly, and it is for that reason that I excluded testimony as to the situation in 1867 or 1842.

Again, we are to assume that congress means something by the phrases which it uses. You will remember that there seemed to be some difficulty in defining the word "worsted." One witness (I think it was Mr. Juilliard) told you that he and some 30 of his associates were unable, after much discussion, to satisfy themselves as to what "worsted" really was. Another witness (Mr. Ammidown) likewise said that there was no such thing as worsted; that "worsted" was an adjective, not a noun; that there was "worsted yarn," worsted being used adjectively, but that there was no such thing as a noun "worsted." Now, the phrase "composed of worsted" is used three times by congress in this very schedule,—the word "worsted" being used as a noun, whether in fact it is or is not a noun. Whether by that word congress meant "combed wool," (a phrase used in the tariff of 1842 apparently as a synonym of "worsted,") or meant "worsted yarn," which the defendant's evidence shows to be the crudest worsted product known to commerce, or whether it meant an unidentified and unidentifiable something, which is produced somewhere between the wool top and the worsted yarn in the process of manufacturing worsted yarn,—whichever of these, or whatever else congress may have meant, it is for you to find out; but you are to find it out on the theory that congress meant something by the phrase "composed of worsted." Finally, then, you will from the evidence before you determine what was meant by the expression "composed of worsted," in the year 1883; how it would at that time have been understood by persons engaged in trade and commerce, or by the community at large, if it had no special or peculiar trade meaning. Having reached a conclusion upon that point, you will next consider whether these goods imported by the plaintiffs are correctly described by that term. If you find that they are, and that they contain no wool which is not worsted, your verdict will be for the plaintiffs; otherwise for the defendant.

The jury found a verdict for the plaintiffs.